IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

VINCENT WILSON,
    Plaintiff,

v.                                                                                    Civil No. 3:22cv692 (DJN)

DEPUTY LAUREANO, *et al.*,
    Defendants.

### MEMORANDUM OPINION

Vincent Wilson ("Wilson" or "Plaintiff"), a Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this 42 U.S.C. § 1983 action alleging that Defendants[1] violated his rights under the Fourteenth Amendment.[2] By Memorandum Opinion and Order entered on September 27, 2023, the Court denied Defendants' Motion to Dismiss and granted Wilson's Motion for Leave to File an Amended Complaint. (ECF Nos. 30–31.) Therefore, the matter proceeds on the Amended Complaint (ECF No. 32), the Motion for Summary Judgment filed by Defendants (ECF No. 40), and the Motion for Partial Summary Judgment filed by Wilson (ECF No. 47). Defendants provided notice pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), and Wilson has filed several responses (ECF Nos. 45, 50–51), and his own Partial Motion for Summary Judgment (ECF Nos. 47–49). For the reasons stated below, Wilson's Partial Motion for Summary Judgment (ECF No. 47) will be denied, Defendants' Motion for Summary

---

[1]    The Defendants are Deputies Laureano and Amaya, Corporal Hagaman, and Sergeant Grant ("Defendants") who all work at the Arlington County Detention Facility. The Court has updated their titles based on their declarations.

[2]    The Court employs the pagination assigned by the CM/ECF docketing system. The Court also corrects the spelling, capitalization, and punctuation in the quotations from the parties' submissions.

Judgment (ECF No. 40) will be granted, and the action will be dismissed.

## I.   WILSON'S CLAIMS

The claims Wilson raises in his Amended Complaint are not identical to those he raised

in his Particularized Complaint. The Court construes Wilson's amended claims to be as follows:

Claim One:   Defendants "using physical force against the Plaintiff or in failing to intervene to prevent the use of force by not allowing the Plaintiff to shower . . . after getting pepper sprayed . . . constituted cruel and unusual punishment in violation of Due Process Clause of the Fourteenth Amendment." (ECF No. 32, at 4–5.)

Claim Two:   "The failure of Defendants . . . in providing a[n] opportunity for the Plaintiff to shower . . . constitute[s] deliberate indifference to a serious risk of harm in violation of [(a)] the Due Process and [(b)] Equal Protection Clauses of the Fourteenth Amendment . . . because Plaintiff ha[s] seen[] other inmates pepper sprayed and given the opportunity to take a reasonable shower." (*Id.* at 5.)

Claim Three:   "The actions of Defendant Laureano in using physical force against the Plaintiff by using some type of martial arts against the Plaintiff . . . constituted the tort of assault and battery under the law of Virginia." (*Id.*)

Claim Four:   Defendants' conduct "in misusing force by peppering spraying the Plaintiff and not giving him a shower . . . violated Plaintiff's Bills of Rights to the Constitution of Virginia Article 1," amounted to the "tort of abuse of process," "the tort of legal malpractice," "the tort of negligence," "the tort of personal injury," "the tort of product liability," "the tort of intentional infliction of emotional distress." (*Id.* at 6–7.)

Wilson requests injunctive relief and monetary damages. (*Id.* at 7–8.)

In their Motion for Summary Judgment, Defendants argue that they did not effectuate a

constitutional violation, that they are entitled to qualified immunity and that Wilson's state law

claims lack merit. (ECF No. 41, at 5–6.)

## II.   THE COURT'S SCREENING OBLIGATIONS

As a preliminary matter, Defendants do not address Wilson's attempt at an equal

protection claim. Notably, Wilson does not offer any evidence in support of this claim, and only

vaguely mentions the Equal Protection Clause in his statement of the claims in the Amended Complaint.

## A.   Standard of Review

Pursuant to the Prison Litigation Reform Act ("PLRA") this Court must dismiss any action filed by a prisoner if the Court determines that the action (1) "is frivolous" or (2) "fails to state a claim on which relief may be granted." 28 U.S.C. §§ 1915(e)(2), 1915A. The first standard includes claims based upon "an indisputably meritless legal theory," or claims where the "factual contentions are clearly baseless." *Clay v. Yates*, 809 F. Supp. 417, 427 (E.D. Va. 1992) (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)). The second standard constitutes the familiar standard for a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Martin*, 980 F.2d at 952. This principle applies only to factual allegations, however, and "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of

3

what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (second alteration in original). Plaintiffs cannot satisfy this standard with complaints containing only "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* Instead, a plaintiff must allege facts sufficient "to raise a right to relief above the speculative level," *id.*, stating a claim that is "plausible on its face," *id.* at 570, rather than merely "conceivable." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp.*, 550 U.S. at 556). For a claim or complaint to survive dismissal for failure to state a claim, the plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002); *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

Lastly, while the Court liberally construes *pro se* complaints, *Gordon v. Leeke,* 574 F.2d 1147, 1151 (4th Cir. 1978), it will not act as the inmate's advocate and develop, *sua sponte*, statutory and constitutional claims that the inmate failed to clearly raise on the face of his complaint. *See Brock v. Carroll*, 107 F.3d 241, 243 (4th Cir. 1997) (Luttig, J., concurring); *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

### B.   Equal Protection Claim (Claim Two (b))

"The Equal Protection Clause . . . is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). To state an equal protection claim, Wilson must allege that: (1) he and a comparator inmate were treated differently and were similarly situated; and (2) the different treatment resulted from discrimination. *See Veney v.*

4

*Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (explaining elements of an equal protection claim). In sum, in Claim Two (b), Wilson states that "[t]he failure of Defendants . . . in providing a[n] opportunity for the Plaintiff to shower . . . constitute[s]" a violation of the "Equal Protection Clause[] of the Fourteenth Amendment . . . because Plaintiff ha[s] seen[] other inmates pepper sprayed and given the opportunity to take a reasonable shower." (ECF No. 32, at 5.) Wilson fails to identify a similarly situated comparator inmate who received different treatment. Wilson also fails to allege facts indicating that Defendants' refusal to allow Wilson a shower resulted from discrimination. Accordingly, Wilson fails to state a plausible equal protection claim, and Claim Two (b) will be DISMISSED for failure to state a claim and as legally frivolous.

### III.    STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility to inform the Court of the basis for the motion, and to identify the parts of the record which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324. When confronting a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c) and 56(e) (1986)).

5

In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). However, a mere scintilla of evidence will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (citing *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

In support of their Motion for Summary Judgment, Defendants submit the declaration of Deputy Laureano (ECF No. 41-1),[3] the declaration of Corporal Phan (ECF No. 41-2), the declaration of Deputy Amaya (ECF No. 41-3), the declaration of Corporal Hagaman (ECF No. 41-4), and the declaration of Sgt. Grant (ECF No. 41-5).

At this stage, the Court is tasked with assessing whether Wilson "has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993). As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. *Celotex Corp.*, 477 U.S. at 324. Wilson filed a variety of responses to the Motion for Summary Judgment and his own Declaration in support of his Motion for Summary Judgment.

---

[3]     Deputy Laureano's declaration contains two paragraphs numbered four. The Court refers to the second paragraph as ¶ 4(b).

Nevertheless, many of his submissions, including his Amended Complaint, are not properly sworn to under penalty of perjury.[4]  Only Wilson's Affidavit (ECF No. 45) and Declarations (ECF No. 49, 51) are properly sworn.[5]

In light of the foregoing submissions and principles, the following facts are established for the Motion for Summary Judgment.  All permissible inferences are drawn in favor of Wilson.

## IV.   UNDISPUTED FACTS

As a preliminary matter, the Court determines that Wilson has not litigated this matter in good faith.  It is evident from his submissions that Wilson has purposely attempted to mislead the Court about the actions taken by the Defendants by leaving out large swaths of the facts where they do not fit into his narrative of the claim.  As reflected below, most of the facts stand undisputed.  However, Wilson's version qualifies as woefully incomplete.

---

[4]     For his Amended Complaint, Wilson states:  "I have read the foregoing complaint and hereby verify that the matters alleged on information and belief, and, as to those, I believe them to be true.  I certify under penalty of perjury that the foregoing is true and correct."  (ECF No. 32, at 8.)  Wilson's "verification" is virtually identical to one that this Court previously rejected in *Hogge v. Stephens*, 2011 WL 2161100, *2–3 (E.D. Va. June 1, 2011), and is substantially similar to one that the United States Court of Appeals for the Fourth Circuit found to be lacking in *Walker v. Tyler Cnty. Comm'n*, 11 F. App'x 270, 274 (4th Cir. 2001).  Where a verification is made "upon information and belief," it "is insufficient for the purposes of opposing a motion for summary judgment because such verification avoids the possibility of perjury."  *Price v. Rochford*, 947 F.2d 829, 832 (7th Cir. 1991); *see also Causey v. Balog*, 162 F.3d 795, 803 n.4 (4th Cir. 1998) ("Because [the court] cannot assess whether [the plaintiff] had first-hand knowledge of [the alleged] facts or whether he is competent to testify to them, [the court] cannot consider them in [its summary judgment] review.").

The Court notes that even if it were to consider this submission, it does not create a genuine material dispute of fact.  Instead, when compared with the submissions of Defendants, Wilson's filing actually supports a conclusion that there are few disputed facts.  And Wilson omitted facts that did not favor his claims.

[5]     While properly sworn, Wilson's Affidavit and Declarations are comprised in part of allegations made "[u]pon information and belief" (*see, e.g.*, ECF No. 45 ¶ 3), legal conclusions and other speculations that do not constitute evidence.

## A.    Wilson's Refusal to Remove His Arm from Food Slot

On November 7, 2021, Wilson was assigned to 11A Housing Unit, and Corp. Phan was on duty in that area. (ECF No. 41-2 ¶ 3.) Because of his history at the facility, Wilson is considered a "2-Deputy Special Directive with Spit Mask" inmate. (*Id.*) Upon returning from lunch, Corp. Phan learned that Wilson had "stuck his arm out of the food slot in protest because 'he wanted out of the block to be away from these [individuals].'" (*Id.*) Wilson threatened Corp. Phan that he would "'throw pee' on [Corp. Phan] if [he] did not comply with the demands to take him out of the block, stating [Corp. Phan] would be his 'number one victim.'" (*Id.*) As a result of Wilson's behavior, Corp. Phan was unable to continue with normal operations for the housing unit and could not continue with the recreation schedule for the unit. (*Id.*)

Deputy Amaya was working in the tower in the 11A Housing Unit that day. (ECF No. 41-3 ¶ 3.) While in the tower, Deputy Amaya observed Wilson stick his arm out of the food slot and then watched him refuse to put it back in his cell. (*Id.*) Deputy Amaya informed Sgt. Grant. (*Id.*) At approximately 11:30 a.m., Sgt. Grant entered 11A Housing Unit to conduct her supervisory rounds. (ECF No. 41-5 ¶ 3.) Sgt. Grant ordered Wilson to put his arm back in his cell, and he refused to comply. (*Id.*) Sgt. Grant explained that inmates may not have their arms hanging outside of their cell, because doing so presents security and safety risks. (ECF No. 41-5 ¶ 3.)

Wilson disobeyed orders to put his arm back in his cell for over an hour. (ECF No. 41-1 ¶ 3.) Officers determined that Wilson needed to be moved to another cell with a different type of food slot that would prevent him from putting his arms through the slot outside of the cell. (*Id.*) By 12:05 p.m., Corp. Phan had repeatedly asked Wilson to move to cell #7 which had the advanced food tray for non-compliant inmates. (ECF No. 41-2 ¶ 4.) Each time he was asked,

8

Wilson stated that he would not go. (*Id.*) Because Wilson refused to cooperate to be moved to a different cell and refused to follow orders, the officers determined that he would need to be extracted from his cell. (ECF No. 41-1 ¶ 3.) Corp. Phan contacted Sgt. Grant and relayed the information about Wilson's actions to her. (ECF No. 41-2 ¶ 4.)

At 12:05 p.m., Wilson was asked again by Deputy Amaya, Corp. Fleming and Corp Phan to comply with orders to place his arm back in his cell, and Wilson refused. (ECF No. 41-5 ¶ 5.)

### B.   Wilson is Extracted from His Cell Using Pepper Spray

At 12:22 p.m., Corp. Phan and Deputy Amaya placed magnet strips over the occupied cells in the housing unit. (ECF No. 41-5 ¶ 6.) At 12:35 p.m., an extraction team formed comprised of Corp. Phan, Corp. Hagaman, Deputy Laureano and Deputy Amaya. (ECF No. 41-1 ¶ 4; ECF No. 41-2 ¶ 5; ECF No. 41-3 ¶ 4; ECF No. 41-4 ¶ 4.) Sgt. Grant observed and began recording. (ECF No. 41-2 ¶ 5; ECF No. 41-5 ¶ 7.) A plan was made to move Wilson to cell # 7 which had the advanced food slot. (ECF No. 41-5 ¶ 4.) When Corp. Hagaman arrived at Wilson's cell, he observed Wilson's arm hanging out of his food slot in cell #15. (ECF No. 41-4 ¶ 3.) Sgt. Grant informed him that Wilson was to be moved to cell #7 and that Wilson had received multiple commands to comply with staff orders, but he refused to allow handcuffs to be applied so that he could be moved. (ECF No. 41-4 ¶ 3.) Sgt. Grant instructed officers that if Wilson still refused to follow staff orders that they were to use pepper spray to gain compliance. (ECF No. 41-4 ¶ 3.)

Corp. Hagaman ordered Wilson to put both hands through the food slot so handcuffs and leg irons could be applied. (ECF No. 41-1 ¶ 4(b); ECF No. 41-3 ¶ 4; ECF No. 41-4 ¶ 4.) Wilson refused and continued hanging his left hand out of the food slot. (ECF No. 41-4 ¶ 4; ECF No. 41-3 ¶ 4; ECF No. 41-2 ¶ 5.) Deputy Laureano had a can of pepper spray in his hand, which

9

Wilson saw. Instead of becoming compliant to avoid contact with the pepper spray, Wilson placed a towel over his neck and face in anticipation of being sprayed. (ECF No. 41-1 ¶ 4(b); ECF No. 41-4 ¶ 3; ECF No. 41-5 ¶ 7.) Sgt. Grant instructed Deputy Laureano to deploy a burst of pepper spray. (ECF No. 41-5 ¶ 7.) Laureano sprayed a short burst of pepper spray under the cell door into Wilson's cell. (ECF No. 41-1 ¶ 4; ECF No. 41-2 ¶ 5; ECF No. 41-3 ¶ 4; ECF No. 41-4 ¶ 4; ECF No. 41-5 ¶ 7.) After the pepper spray was deployed, Corp. Hagaman asked Wilson if he was ready for staff to apply handcuffs. (ECF No. 41-4 ¶ 4.) Wilson looked at Corp. Hagaman and shook his head from side to side indicating no. (ECF No. 41-3 ¶ 4; ECF No. 41-4 ¶ 4.)

At 12:36 p.m., Wilson eventually complied with the command to allow himself to be handcuffed, and Deputy Laureano applied cuffs to his wrists. (ECF No. 41-1 ¶ 4(b); ECF No. 41-3 ¶ 4; ECF No. 41-5 ¶ 8.) Officers opened the cell door, and Corp. Hagaman applied leg irons to Wilson. (ECF No. 41-1 ¶ 4(b); ECF No. 41-5 ¶ 8.)

### C.  Wilson Refuses to Have Restraints Removed

Officers then moved Wilson to cell #7 in 11A Housing Unit. (ECF No. 41-1 ¶ 5; ECF No. 41-2 ¶ 6; ECF No. 41-5 ¶ 8.) However, when they reached the door of that cell, Wilson refused to put both arms through the food slot to allow officers to remove the restraints. (ECF No. 41-1 ¶ 5; ECF No. 41-3 ¶ 4; ECF No. 41-5 ¶ 9.) Instead, Wilson "tensed up his body and used physical force to remain in this position, and refused to place his hands in the food slot." (ECF No. 41-4 ¶ 5.) Deputy Laureano attempted to gain Wilson's compliance by giving verbal commands and then two strikes to his common peroneal, but Wilson refused to comply. (ECF No. 41-1 ¶ 5; ECF No. 41-5 ¶ 9.) Corp. Hagaman also attempted to gain Wilson's compliance by using the mandibular angle technique, "by placing my left thumb against the back of his jaw

under his right ear," but that too had no effect on Wilson. (ECF No. 41-4 ¶ 5; ECF No. 41-5 ¶ 9.) Because Wilson would not comply with orders, Wilson was placed in the cell with the cuffs and leg irons on. (ECF No. 41-1 ¶ 5; ECF No. 41-3 ¶ 4.)[6]

###    D.    Wilson Floods His Cell and Is Moved to Crisis Cell

Shortly after securing Wilson in the cell, Deputy Laureano and Deputy Amaya observed Wilson climb up on the desk and attempt to break the fire sprinkler system. (ECF No. 41-1 ¶ 5.) The officers yelled for him to get down, and Wilson ignored their commands. (*Id.*) Before officers could call the 11A tower to open the door, Wilson had broken the sprinkler head and the cell began to flood. (*Id.*) Corp. Phan observed water exiting the cell. (ECF No. 41-2 ¶ 7.) Corp. Hagaman heard the loud sound of gushing water and observed water pouring down the hall and into the day area from under the door of cell #7. (ECF No. 41-4 ¶ 6.) Corp. Hagaman asked Central Control to open the stairway door so that they could access the water shut off. (ECF No. 41-4 ¶ 5.) Corp. Hagaman and Corp. Phan turned the water off to the sprinkler system. (ECF No. 41-1 ¶ 5; ECF No. 41-2 ¶ 8.) After turning the valves, Corp. Hagaman could hear the water gush slowing down and eventually stop. (ECF No. 41-4 ¶ 6.) However, the water was coming out of the sprinkler for approximately ten minutes. (*Id.*)

Corp. Hagaman requested that blankets be put down to help absorb the large amount of water on the floor of the day room. (*Id.* ¶ 7; ECF No. 41-5 ¶ 10.)

Sgt. Grant contacted the 11B Housing Unit Deputy to move Wilson into a crisis cell because he was a danger to the operations of the facility and a fifteen-minute watch log was generated. (ECF No. 41-5 ¶ 11.) While waiting for the Tower Deputy to open cell #7, Corp.

---

[6]    Wilson avers: "I did not resist or threaten the deputies . . . . Rather, I just walked to cell #7." (ECF No. 51 ¶ 7.) It is undisputed that Wilson walked to the cell without event. However, once they arrived at the cell, he refused to enter. Wilson does not dispute this fact in any sworn submission.

Hagaman observed Wilson retrieve the mattress from the bunk and put it front of the door. (ECF No. 41-4, at ¶ 7.) Corp. Hagaman instructed Wilson to put the mattress down and come to the door, Wilson complied and the cell door was opened. (*Id.*)

At 12:51 p.m., officers then removed Wilson from cell #7 and moved him to Unit 11B Crisis Cell #3 without any issue. (ECF No. 41-1 ¶ 6; ECF No. 41-4 ¶ 8; ECF No. 41-5 ¶ 12; ECF No. 51 ¶ 7.) Deputy Amaya held Wilson's arm while Corp. Phan used the 911 tool to remove his shirt and pants, and all other items such as shoes, socks, boxers and inmate wristband were also removed. (ECF No. 41-2 ¶ 8; ECF No. 41-3 ¶ 6; ECF No. 41-4 ¶ 8; ECF No. 41-5 ¶ 12.)

At 12:53 p.m., Nurse Beverly Franks entered the crisis cell to assess and check Wilson's vitals and medically cleared him. (ECF No. 41-1 ¶ 6; ECF No. 41-4 ¶ 8; ECF No. 41-5 ¶ 13.) After Nurse Franks left the cell, Corp. Hagaman removed the leg irons and the remainder of Wilson's clothes from the cell. (ECF No. 41-4 ¶ 8; ECF No. 41-5 ¶ 13.) At 12:58, Deputy Laureano removed Wilson's handcuffs through the food slot. (ECF No. 41-4 ¶ 8; ECF No. 41-5 ¶ 13.) Wilson was provided with a green suicide safe vest and a blanket. (ECF No. 41-4 ¶ 8.)

Wilson asked the officers to be placed in the shower, but they refused. (ECF No. 45 ¶¶ 7–8.) The next day Wilson was placed in the crisis cell shower area by Deputy Bowie. (*Id.* ¶ 9.) Wilson description of his injuries changes throughout his many sworn statements. Wilson first describes that he was "burning, skin red, skin looked bruised from pepper spray, and can't sleep for the whole night, tossing and turning" and that he "still experience[ed] the burning sensation for about a week or a little over a week." (*Id.* ¶¶ 9, 11.) Next, Wilson describes that he "was hurting and burning badly with red bruises on my arm for days and [he] couldn't move when [he] was trying to really sleep." (ECF No. 49 ¶ 6.) Finally, Wilson contends that he

suffered "swellings, bruises, and red marks, it looked like, as a result from not getting in the shower for at least one day." (ECF No. 51 ¶ 8.)

## V. ANALYSIS

### A.    Qualified Immunity

Although the record makes clear that Wilson's constitutional claims lack merit, and Defendants would also be entitled to summary judgment on that ground, the Court stayed discovery at Defendants' request until such time that the Court ruled on their argument that they are entitled to qualified immunity. (ECF No. 42.) The United States Court of Appeals for the Fourth Circuit recently explained the standard for qualified immunity in this Circuit:

> "Qualified immunity protects government officials from civil liability and suit insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019) (internal quotation marks omitted), *as amended* (June 10, 2019). "To overcome an official's claim of qualified immunity, the plaintiff must show: (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct. A court need not address those inquiries in sequence, but instead may exercise its sound discretion in deciding which issue to first address. The official is entitled to qualified immunity if either prong is not satisfied." *Id.* (citations and internal quotation marks omitted).
>       "In the Fourth Circuit, we have a split burden of proof for the qualified-immunity defense. The plaintiff bears the burden on the first [(constitutional right)] prong, and the officer bears the burden on the second [(clearly established)] prong." *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022). In conducting the qualified-immunity analysis, we view the evidence in the light most favorable to [the plaintiff]. *See Aleman* [*v. City of Charlotte*], 80 F.4th [264] at 287 [(4th Cir. 2023)] (describing qualified-immunity analysis at the summary-judgment stage).

*Jones v. Solomon*, 90 F.4th 198, 207–08 (4th Cir. 2024) (fourth through sixth alterations added).

As discussed below, because Wilson fails to show that Defendants violated his constitutional rights, the Court need not turn to the second prong of the inquiry.

### 1.   Wilson's Unprecise Claim and the Murky Law

In Claim One, Wilson contends that Defendants "using physical force against the Plaintiff or in failing to intervene to prevent the use of force by not allowing the Plaintiff to shower . . . after getting pepper sprayed . . . constituted cruel and unusual punishment in violation of Due Process Clause of the Fourteenth Amendment." (ECF No. 32, at 4–5.) Notably, Wilson does not specifically allege a claim of excessive force from being pepper sprayed. However, later in support of his Declaration, he states that: "The Complaint alleges that I was pepper sprayed without given a chance to decontaminate and that I was assaulted. I submit this declaration in support of my motion for partial summary judgment on my claim of excessive use of force." (ECF No. 49, at 1.) Courts have considered the use of pepper spray and inadequate decontamination as a single claim of excessive force. *See Jacoby v. Mack*, 755 F. App'x 888, 896 & n.12 (11th Cir. 2018) (recognizing that this can be pled as a single claim or as a claim of excessive force based on the pepper spray and a separate claim of deliberate indifference for the denial of a shower) (citing *Danley v. Allen*, 540 F.3d 1298, 1306 (11th Cir. 2008)). However, in Claim One, Wilson uses the word "or" between the use of force and the refusal to allow him to shower, indicating that he intends to identify two distinct uses of excessive force.

While Wilson's claims do not qualify as precise, because he is proceeding *pro se*, the Court generously construes Wilson to argue in Claim One that he was subjected to excessive force when he was pepper sprayed and then subjected to excessive force again when officers refused to let him shower. Later, in Claim Two (a), the Court construes Wilson to argue that the

failure to provide him with a shower also amounted to deliberate indifference to an unjustifiably high risk of harm.[7]

### 2. Excessive Force (Claim One)

#### a. Standard for Excessive Force Claims

Under the Fourteenth Amendment standard, a detainee must demonstrate that a defendant "inflicted unnecessary and wanton pain and suffering upon the detainee." *Carr v. Deeds*, 453 F.3d 593, 605 (4th Cir. 2006), *abrogated on other grounds by Wilkins v. Gaddy*, 559 U.S. 34 (2010). A detainee may prevail by "providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose." *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015).[8]

Factors a court may consider to determine whether force qualifies as objectively unreasonable may include:

> the relationship between the need for the use of force and the amount of force used; the extent of [the detainee's] injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the [detainee] was actively resisting.

*Id.* at 397 (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Because "officers facing disturbances 'are often forced to make split-second judgments'. . . a court must judge the reasonableness of the force used from the perspective and

---

[7]    The Court notes that the Fourth Circuit has analyzed the denial of decontamination as both an excessive force claim and as a claim alleging medical indifference. *See Mann v. Failey*, 578 F. App'x 267, 273 (4th Cir. 2014); *Williams v. Benjamin*, 77 F.3d 756, 764–65 (4th Cir. 1996) (analyzing claims as alleging excessive force); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (analyzing claim as alleging deliberate indifference to medical needs).

[8]    In *Kingsley*, the Supreme Court determined that the appropriate standard for the Fourteenth Amendment is "only that the officers' use of that force was *objectively* unreasonable," not that "the officers were *subjectively* aware that their use of force was unreasonable . . . ." 576 U.S. at 391.

15

with the knowledge of the defendant officer." *Id.* at 399 (citing *Graham*, 490 U.S. at 397).  The

Court must recognize that "agents of the state are permitted to exercise a certain degree of force

in order to protect the interests of society." *Sawyer v. Asbury*, 537 F. App'x 283, 294 (4th Cir.

2013) (quoting *Justice v. Dennis*, 834 F.2d 380, 382 (4th Cir. 1987), *vacated on other grounds by*

490 U.S. 1087 (1989)).  Thus, not every "push or shove, even if it may later seem unnecessary,"

comprises a constitutional violation. *Orem v. Rephann*, 523 F.3d 442, 447 (4th Cir. 2008)

(quoting *Graham*, 490 U.S. at 396), *abrogated on other grounds by Wilkins*, 559 U.S. 34.

Consequently, the Court "must accord due deference to an officer's efforts to restrain a detainee

when faced with a dynamic and potentially violent situation; otherwise, 'we would give

encouragement to insubordination in an environment which is already volatile enough.'"

*Scarbro v. New Hanover Cty.*, 374 F. App'x 366, 370 (4th Cir. 2010) (quoting *Grayson v. Peed*,

195 F.3d 692, 696 (4th Cir. 1999)).  And the Court must determine whether officers used

excessive force "from the perspective of a reasonable officer on the scene, including what the

officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397.

On the record before the Court, Wilson has failed to demonstrate that Defendants

"inflicted unnecessary and wanton pain and suffering upon [him]." *Carr*, 453 F.3d at 605.  To

the contrary, the record establishes that Wilson ignored repeated commands of officers to place

his hands back in his cell, threatened officers, refused to be moved to a different cell and then

broke the sprinkler system.  Wilson created a serious security risk, and the application of force

strikes the Court as limited, measured and reasonable under the circumstances.  The record

demonstrates that Defendants applied force in a good-faith effort to restore discipline in light of

Wilson's excessively defiant behavior and the security risk that Wilson created.

16

**b      Use of Pepper Spray**

In his Amended Complaint, Wilson only challenges the first and second uses of force —

being pepper sprayed and not being permitted to shower — under the Fourteenth Amendment.[9]

First, the Court considers "the relationship between the need for the use of force and the amount

of force used." *Kingsley*, 576 U.S. at 397.  The record demonstrates that Wilson refused

repeated commands to put his hands back in his cell.  Wilson threatened Corp. Phan that he

would throw urine on him and indicated that Corp. Phan would be his number one victim.  When

Wilson learned that he was to be moved to a different cell, he again refused repeated commands

to put his hands out of the slot to be handcuffed.  Wilson observed the extraction team gathering

outside his cell and saw Deputy Laureano holding the pepper spray canister.  At that point,

instead of complying with the officers' orders to avoid being pepper sprayed, Wilson defiantly

placed a towel over his face and head to prevent the spray from contacting his face.  Given these

circumstances, the "need for the use of force" was obvious, immediate and ongoing.  *Id.*  Sgt.

Grant then instructed Deputy Laureano to deploy the pepper spray and Deputy Laureano

deployed a short burst of spray under the cell door.

Wilson's actions threatened officers, required officers to be pulled from their normal

duties and interfered with the normal operation of the 11A housing unit, including preventing his

unit mates from going to recreation.  Officers applied the amount of force that qualified as

necessary to generate compliance from Wilson in order to move him to a different cell where he

could no longer stick his hands through the food slot.  Defendant Laureano only delivered a short

burst of spray, and Wilson eventually allowed himself to be handcuffed.  In this instance, officers

faced a sizable "need for the use of force," and the "amount of force used" was necessary,

---

[9]      Wilson's claim related to the subsequent use of physical force by Deputy Laureano only
constitutes a state law claim of assault and battery.  (*See* ECF No. 32, at 5.)

proportionate and appropriate in light of the circumstances. *Id.* The first *Kingsley* factor clearly cuts against Terry's claim.

Second, the Court examines "the extent of [the detainee's] injury." *Id.* Wilson insists, at worst, that he suffered "swellings, bruises, and red marks, it looked like, as a result from not getting in the shower for at least one day." (ECF No. 51 ¶ 8.) Wilson indicates that these injuries were on his arm. (ECF No. 49 ¶ 6.) However, pepper spray "is designed to disable a subject without causing permanent physical injury." *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002); *see Jackson v. Morgan*, 19 F. App'x 97, 102 (4th Cir. 2001) (explaining that "the effects of OC pepper spray did not last more than an hour and had no known permanent effects"). After coming into contact with the pepper spray, Wilson was moved to a different cell, where he immediately broke the sprinkler system. Wilson was in that cell for ten minutes while water poured from the ceiling. Wilson clearly had a ten-minute opportunity to decontaminate himself. On this record, any injuries that Wilson suffered could readily be attributed to the initial contact with pepper spray and from later resisting officers which required the officers to apply force to Wilson in an attempt to gain his compliance, not from the Defendant's refusal to allow him to shower. While certainly not dispositive, this factor cuts against Wilson's claim.

Third, courts should consider "any effort made by the officer to temper or to limit the amount of force." *Kingsley*, 576 U.S. at 397. Officers asked Wilson for over an hour to comply with their many orders to remove his arm from the food slot and then to make himself available to be cuffed. Wilson repeatedly refused. It is undisputed that Wilson refused to cooperate and escalated the situation. Wilson also saw the extraction team arrive at the cell and knew that the officers were going to deploy pepper spray. When Wilson saw the pepper spray, instead of deciding to become compliant to avoid the deployment of the spray, he instead covered his face

18

and head with a towel. In response, Defendant Laureano delivered a short burst of pepper spray under the door to gain Wilson's compliance. As such, the third factor weighs against Wilson's claim. *Cf. Williams*, 77 F.3d at 763 (explaining that "because a limited use of mace constitutes a relatively 'mild' response compared to other forms of force, the initial application of mace indicates a 'tempered' response by the prison officials").[10]

Finally, the Court must also consider "the severity of the security problem at issue," *Kingsley*, 576 U.S. at 397, and "the threat reasonably perceived by the officer, and whether the [detainee] was actively resisting." *Id.* Wilson was also a known security risk, had previously caused problems in the jail, and was considered a "2-Deputy Special Directive with Spit Mask" inmate. (ECF No. 41-2 ¶ 3.) Wilson had his arm out of his food slot, ignored repeated commands to put it back in his cell and threatened an officer that he would throw urine on him. When officers decided to move Wilson to a different cell that would prevent Wilson from putting his arm in the food slot, Wilson again refused repeated commands to allow himself to be handcuffed. At this point, Wilson had been ignoring commands for an hour. Wilson's actions threatened officers, required officers to be pulled from their normal duties and interfered with the normal operation of the 11A housing unit. When Wilson knew that the pepper spray was about to be deployed, instead of deciding to comply to avoid being sprayed, he placed a towel over his head. Under the circumstances, Wilson created a serious security risk, and any officer would

---

[10]   It is arguable that by not allowing Wilson a decontamination shower, Defendants did not do all they could to "temper" their response. *Kingsley*, 576 U.S. at 397. However, Defendants observed that Wilson covered his head and face to keep the pepper spray out of his eyes. Wilson also only identifies that his arm was red, swollen and burning (ECF No. 49 ¶ 6), and mentions nothing about the irritant getting in his eyes or causing breathing problems. Moreover, immediately after being sprayed, Wilson broke the sprinkler head in his cell, and water was streaming from the ceiling for ten minutes. A reasonable officer could believe that Wilson had ample time to decontaminate himself. Defendants removed all of Wilson's contaminated clothes, and the nurse examined Wilson and medically cleared him.

have reasonably perceived a risk to their personal safety.  Thus, Wilson fails to establish that

Defendant used excessive force by deploying pepper spray under his cell door.  *Cf. Williams*, 77

F.3d at 763 (finding no excessive force where officer deployed a large amount of CS tear gas

into inmate's cell who threw "foul-smelling liquids" out of cell and then refused to remove his

arm from window after officer commanded him to); *Jackson*, 19 F. App'x at 99, 102–03 (4th Cir.

2001) (finding no excessive force where officers deployed pepper spray twelve times when

inmate refused to comply with commands to move from his cell).  Because Defendants' use of

pepper spray was not excessive, this aspect of Claim One lacks merit and will be DISMISSED.

### c.      Refusal of a Shower

In Claim One, Wilson also contends that Defendants' "failing to intervene to prevent the

use of force by not allowing the Plaintiff to shower . . . after getting pepper sprayed . . .

constituted cruel and unusual punishment in violation of Due Process Clause of the Fourteenth

Amendment." (ECF No. 32, at 4–5.)  The refusal to allow an inmate a decontamination shower

after being pepper sprayed may amount to excessive force.  *See Mann v. Failey*, 578 F. App'x

267, 269 (4th Cir. 2014) (construing denial of decontamination shower for four or five days as an

excessive force claim); *Williams*, 77 F.3d at 765 (finding excessive force when guards "spray[ed]

an inmate in the face with mace and then confine[d] him in four-point restraints for an extended

period of time without permitting him to wash or use the toilet, fumigating the cell, and without

allowing him the benefit of medical attention of any kind").  However, the record does not show

that the Defendants' refusal to permit Wilson to shower amounts to excessive force in this

instance.

Defendants observed Wilson place a towel over his head and face before the pepper spray

was deployed under the door, thereby protecting his eyes, nose, mouth and head from the

spray.[11]  Immediately after, Wilson broke the sprinkler system in the cell where he had been

moved, and the water was spraying from the ceiling for ten minutes.  If Wilson was in

discomfort or pain from the pepper spray, he could have decontaminated himself by standing in

the stream of water for those ten minutes, and a reasonable officer could have believed that he

had done so and thus no longer needed a decontamination shower.  Although Defendants denied

Wilson's request to shower, he had ample opportunity to decontaminate himself.  Then, after

Defendants moved Wilson to the crisis cell, Defendants removed Wilson's contaminated clothes,

and the nurse was sent to check on him and cleared Wilson from a medical perspective.  Based

on the record before the Court, Wilson fails to demonstrate that Defendants "inflicted

unnecessary and wanton pain and suffering upon [him]," through the refusal to allow Wilson to

shower.  *Carr*, 453 F.3d at 605; *cf. Goss v. Larry*, 2021 WL 5332512, at *8–9 (D.S.C. Oct. 12,

2021) (finding no Eighth Amendment violation when despite being denied a shower, inmate was

"[g]iven significant decontamination measures," which included permitting plaintiff to rinse his

face for a few minutes, change his clothes and receive medical treatment), *R & R adopted by* C/A

No. 2:20-cv-2978-JFA-MGB, 2021 WL 5330633 (D.S.C. Nov. 16, 2021).

Wilson fails to demonstrate that he was subjected to excessive force under the Fourteenth

Amendment.  Thus, Defendants are also entitled to qualified immunity.  Accordingly, Claim One

lacks merit and will be DISMISSED.

---

[11]     In his vague description of his injuries in his sworn statements, Wilson notably does not
indicate that he experienced any eye irritation or breathing problems.

### 3.     Deliberate Indifference (Claim Two (a))

#### a.     Fourteenth Amendment Deliberate Indifference Standard

Once again, because Wilson is a "'pretrial detainee and not a convicted prisoner,' the Fourteenth Amendment, and not the Eighth Amendment, governs his claim[s]." *Mays v. Sprinkle*, 992 F.3d 295, 300 (4th Cir. 2021) (quoting *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988)). In the wake of *Kingsley*, the Fourth Circuit recently clarified what pretrial detainees must demonstrate with respect to claims alleging that jail officials failed to appropriately respond to their medical needs.[12] *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023). Specifically, pretrial detainees must demonstrate:

> (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

*Id.* The Fourth Circuit explained:

> The objective test we adopt today differs from our prior subjective test in one respect only. The plaintiff no longer has to show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm. That showing remains sufficient, but it is no longer necessary. Now, it is sufficient that the plaintiff show that the defendant's action or inaction was, in *Kingsley*'s words, "objectively unreasonable," 576 U.S. at 397; that is, the plaintiff must show that the defendant should have known of that condition and that risk, and acted accordingly. Or as the Supreme Court put it when describing civil recklessness in *Farmer*, it is enough that the plaintiff show that the defendant acted or failed to act "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."

*Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)).

---

[12]     It is not entirely clear if Wilson's complaints about being denied a shower after he was pepper sprayed would qualify as deliberate indifference to a serious medical need or simply as an unjustifiably high risk of harm. The Court need not differentiate because the standard stands as the same — whether the Defendants' action or inaction qualified as "objective unreasonable." *Kingley*, 576 U.S. at 397

### b.    Denial of a Shower

In Claim Two (b), Wilson argues that "[t]he failure of Defendants . . . in providing a[n] opportunity for the Plaintiff to shower . . . constitute[s] deliberate indifference to a serious risk of harm in violation of (a) the Due Process . . . Clause[] of the Fourteenth Amendment." (ECF No. 32, at 5.) Wilson must show that Defendants' action or inaction with respect to the refusal to allow Wilson a shower qualified as "objectively unreasonable." *Kingsley*, 576 U.S. at 397. Wilson must demonstrate that Defendants "acted or failed to act 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Short*, 87 F.4th at 611.

Clearly, "an inmate's rights can be violated when officers withhold proper medical attention or basic hygienic remedies such as a shower or a chance of clothes after deploying a chemical agent, thereby allowing the painful effects to linger." *Fobbs v. Hunt*, 2021 WL 1792087, at *9 (E. D. Va. May 5, 2021); *see also Iko v. Shreve*, 535 F.3d 225, 240, 242–43 (4th Cir. 2008) (determining that officers were deliberately indifferent to inmate's medical needs when they "were all aware that Iko had been doused in pepper spray," saw him collapse in the medical room, and did not seek any medical evaluation of even decontamination).[13]  However, that is not the case here.

Defendants observed Wilson place a towel over his head and face before the pepper spray was deployed under the door, thereby protecting his eyes, nose, mouth and head from the spray. Immediately after, it is undisputed that Wilson broke the sprinkler system in the cell where he

---

[13]     The Fourth Circuit decided *Short v. Hartman* in December of 2023, altering the standard of review for claims of deliberate indifference for pretrial detainees.  Accordingly, there are few cases that address these claims under the new standard.  The Court looks to prior decisions under the Eighth Amendment for guidance on the objective inquiry.

had been moved, and the water was spraying from the ceiling for ten minutes. If Wilson was in

discomfort or pain from the pepper spray, he could have decontaminated himself by standing in

the stream of water for those ten minutes, and a reasonable officer could have believed that he

had done so and no longer needed a decontamination shower. *Cf. Williams*, 77 F.3d at 763

(explaining that "prompt washing of the maced area of the body will usually provide immediate

relief from pain" (citation omitted)). Accordingly, while Defendants denied Wilson's request for

a shower, Wilson clearly had an opportunity to wash off the pepper spray. *Townsend v. Anthony*,

C.A. 2006 WL 2076920, at *3, *4 (D.S.C. July 24, 2006) (considering inmate to have

"decontaminate[d] himself" after he "bust[ed] the sprinkler system to get water" to wash his face

after being pepper sprayed).

Once Wilson was moved to the crisis cell, officers removed all of Wilson's contaminated

clothing. Moreover, a nurse came to the crisis cell, checked on Wilson and medically cleared

him. Thus, Wilson fails to demonstrate that Defendants "failed to act 'in the face of an

unjustifiably high risk of harm that is either known or so obvious that it should be known,'" by

not sending him to the shower. *Short*, 87 F.4th at 611 (citing *Farmer*, 511 U.S. at 836.) In sum,

Defendants' inaction does not qualify as objectively unreasonable. *Cf. Moskos v. Hardee*, 24

F.4th 289, 298 (4th Cir. 2022).[14] Wilson fails to establish that Defendants violated his rights

---

[14]     In *Moskos*, the Fourth Circuit noted:

> In circumstances such as these, involving a short delay in decontamination, without
> aggravating factors such as a serious medical reaction, courts have consistently
> found that the objective prong [of the Eighth Amendment] is not satisfied. And the
> facts here do not remotely resemble cases where we have found the objective prong
> to be met, as with an inmate who collapsed and subsequently died after the use of
> pepper spray, or an inmate who was denied medical attention for several days while
> vomiting blood.

*Moskos*, 24 F.4th at 298.

under the Fourteenth Amendment. Moreover, Defendants are entitled to qualified immunity on this claim.[15] Claim Two (a) lacks merit and will be DISMISSED.

### 4.   State Law Claims (Claims Three and Four)

"Although a federal court has discretion to assert pendent jurisdiction over state claims even when no federal claims remain, certainly[ ] if the federal claims are dismissed before trial . . . the state claims should be dismissed without prejudice." *Alexandria Resident Council, Inc. v. Alexandria Redevelopment & Hous. Auth.*, 11 F. App'x 283, 287 (4th Cir. 2001). Accordingly, Claims Three and Four will be DISMISSED WITHOUT PREJUDICE.

---

[15]    Even if the Court were to determine that Wilson had shown a constitutional violation, the right purportedly violated by Defendants does not qualify as clearly established under the second prong of the qualified immunity analysis. The appropriate inquiry is "whether the law 'is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Halcomb v. Ravenell*, 992 F.3d 316, 320 (4th Cir. 2021). At the time of the events giving rise to Wilson's claim (November 7, 2021), courts "looked to the Eighth Amendment precedents in considering a Fourteenth Amendment claim of deliberate indifference to serious medical needs," which involved an objective and subjective inquiry. *Mays*, 992 F.3d at 300. Nevertheless, at that time, it was "clearly established that the Eighth Amendment may be violated, if following exposure to pepper spray, a prison inmate is not provided with the opportunity to shower or wash off the offending substance, at least when it is safe to do so." *Wagner v. Warden*, No. CV ELH-14-791, 2016 WL 7178297, at *12 (D. Md. Dec. 8, 2016); *see Williams*, 77 F.3d at 768 (finding denial of decontamination can give rise to an Eighth Amendment claim). However, that is not the situation in Wilson's case.

Based on the facts of this case, a reasonable officer would not have understood that denying Wilson a shower would amount to a deliberate indifference to a substantial serious risk of harm. Wilson does not complain of any injury to his face or eyes, and the Defendants could assume that by covering his face and head with a towel, he avoided contact with the pepper spray in those areas. Wilson had been in a cell for ten minutes with a broken sprinkler spraying on him and thus had an opportunity to wash himself off. A reasonable officer could assume that Wilson decontaminated himself in the stream of water. Defendants removed Wilson's contaminated clothing, and a nurse medically cleared him several minutes later. Thus, the law is not sufficiently clear in these circumstances that every reasonable officer would have understood that he was violating Wilson's Fourteenth Amendment rights by not allowing him to shower.

## VI.    THE ACTION IS FRIVOLOUS AND MALICIOUS

Under the Prison Litigation Reform Act ("PLRA"), this Court must dismiss a "case at

any time if the [C]ourt determines that" the action "is frivolous or malicious." 28 U.S.C.

§ 1915(e)(2)(B)(i).  The first standard includes claims based upon "'an indisputably meritless

legal theory,'" or claims where the "'factual contentions are clearly baseless.'"  *Clay v. Yates*,

809 F.Supp. 417, 427 (E.D. Va. 1992) (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)).

This provision applies to cases dismissed at the summary judgment stage.  *See Blakely v. Wards*,

701 F.3d 995, 1001 (4th Cir. 2012).  The record reflects that the factual contentions in the

present action that Defendants used excessive force against him or were deliberately indifferent

to a serious risk of harm "are clearly baseless." *Id.* (quoting *Neitzke*, 490 U.S. at 327); *see*

*Blakely*, 701 F.3d at 1000 n.2 ("Making an [Americans with Disabilities Act] claim without

being disabled surely supports a frivolity determination and certainly supported the district

court's decision that that dismissal counted as a strike.").  Thus, the action qualifies as factually

frivolous pursuant to § 1915A(b)(1).

With respect to the second standard, i.e., the maliciousness of an action, this Court has

observed that:

> A litigant may be deemed to act maliciously if his actions "[i]mport a wish to vex,
> annoy, or injure another, or an intent to do a wrongful act, and may consist in direct
> intention to injure, or in reckless disregard of another's rights."  BLACK'S LAW
> DICTIONARY, Special Fifth Ed. at 863 (1981).  Therefore, "the court must assess
> the character of the allegations insofar as they indicate a motive on the part of the
> plaintiff to merely harass or vex the defendants rather than to seek redress for a
> legitimate legal claim."  *Daves v. Scranton*, 66 F.R.D. 5, 7 (E.D. Pa. 1975).

*Cain v. Com. of Va.*, 982 F. Supp. 1132, 1136 (E.D. Va. 1997).  Further, "[t]he courts have long

recognized that inmate complaints against state officials are a particularly fertile arena for

frivolous and malicious litigation."  *Id.* (citing *Daye v. Bounds*, 509 F.2d 66, 68 (4th Cir. 1975)).

26

This is true, in part, because incarcerated litigants, "possess both time and dissatisfactions in abundance." *Cochran v. Morris*, 73 F.3d 1310, 1316 (4th Cir. 1996). Furthermore, in assessing whether an action is malicious, the Court's review is not limited to the current complaint but is guided by the plaintiff's past litigious conduct. *Id.* at 1316–17.

Here, Wilson has filed scores of civil actions in this Court, and in other courts, harassing individuals who are charged with maintaining his ongoing detention. Indeed, Wilson has amassed more than three cases dismissed under 28 U.S.C. 1915.[16] Here, officers were forced to pepper spray Wilson, because he continually refused to cooperate, and Wilson knew that he was about to be pepper sprayed. Instead of deciding to comply with Defendants' orders to avoid being sprayed, Wilson placed a towel over his head. Wilson then immediately broke the sprinkler head and flooded his cell, thereby negating the need for a decontamination shower. Given the circumstances and based on Wilson's purposeful omission of relevant, material and dispositive facts in this case, the Court concludes that Wilson has once again initiated the current lawsuit in bad faith, and to harass and inconvenience the Defendants. Accordingly, the Court will also dismiss the action as MALICIOUS pursuant to § 1915A(b)(1).

## VII.   CONCLUSION

Defendants' Motion for Summary Judgment (ECF No. 52) will be GRANTED. Wilson's Motion for Summary Judgment will be DENIED (ECF No. 68), because he has not established any entitlement to relief. Wilson's constitutional claims will be DISMISSED. The state law

---

[16]     That statute provides: "In no event shall a prisoner bring a civil action [*in forma pauperis*] if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." Wilson has had at least seven cases dismissed in this Court as frivolous, malicious or for failing to state a claim. *See Wilson v. United States*, No. 3:24cv159 (DJN) (E. D. Va. Mar. 8, 2024) (citing cases previously dismissed under 28 U.S. § 1915).

claims will be DISMISSED WITHOUT PREJUDICE.  The Clerk will be DIRECTED to note

the disposition of the action for the purposes of 28 U.S.C. § 1915(g).  The action will be

DISMISSED.

Let the Clerk file a copy of this Memorandum Opinion electronically and send a copy to

Wilson.

An appropriate Final Order shall issue.

_____  /s/

David J. Novak
United States District Judge

Richmond, Virginia
Dated: April 18, 2024